UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| **CRUM & FORSTER SPECIALTY INSURANCE CO.** | **CIVIL ACTION NO: 12-3080** |
| **VERSUS** | **JUDGE DONALD E. WALTER** |
| **EXPLO SYSTEMS INC.** | **MAGISTRATE JUDGE HAYES** |

### MEMORANDUM RULING

Before the Court is a Motion for Partial Summary Judgment [Doc. #149], filed by Plaintiffs Crum & Forster Specialty Insurance Company ("CFS") and Seneca Specialty Insurance Company ("Seneca"), in this insurance dispute. Plaintiffs seek summary judgment declaring that: (a) they have no duty to defend or indemnify Defendant Explo Systems, Inc. ("Explo") for any claims involving or arising out of either the October 15, 2012 explosion at Camp Minden or the resultant evacuation of Camp Minden and the surrounding area; and (b) they have no obligation to pay any claims asserted by the intervenors in this action. Plaintiffs have filed briefs in support of the motion for summary judgment [Docs. ##150, 186, and 187]. Intervenor Robert W. Hayden ("Intervenor") opposes the motion [Doc. #167].[1] For the following reasons, Plaintiffs' motion is **GRANTED**.

### BACKGROUND

On October 15, 2012, a large explosion occurred at Explo's munitions storage facility at

---

[1] Intervenor lives in the area surrounding Camp Minden and meets the requirements for class membership in an action filed in Louisiana's 26th Judicial District Court, Webster Parish, Louisiana under Civil Docket No. 72,717, *Roger Reeves et al v. Explo Systems Inc. et al*. [Doc. #115, p. 1, ¶ 1]. Intervention was allowed to to protect Intervenor's, and the prospective class's, interests in any insurance proceeds, as same could be adversely impacted by the outcome of this insurance dispute. [Doc. #114].

1

Camp Minden, Louisiana. On November 28, 2012, the surrounding area, including the town of Doyline, Louisiana, was evacuated as a result of the explosion. On November 29, 2012, the citizens of Doyline filed a class action suit in Louisiana state court against Explo for damages arising out of the explosion and subsequent evacuation. *See Susan Fullerton et al v. Explo Systems, Inc.*, No. 72,717, Division A, 26th Judicial District Court, Parish of Webster, State of Louisiana.[2] Claims include bodily injury, mental anguish and property damage due to the explosion; expenses, inconvenience, and loss of use of property incurred as a result of the evacuation; and financial losses due to the explosion and evacuation. On December 17, 2012, the *Fullerton/Reeves* plaintiffs added CFS as a defendant. Explo tendered the defense of the *Fullerton/Reeves* action to CFS on December 3, 2012, and CFS denied coverage on December 13, 2012.

CFS filed the instant suit on December 14, 2012; Seneca joined as a party plaintiff on December 27, 2012. Plaintiffs seek declaratory judgment against their insured, Explo, as well as rescission of the liability policy in effect at the time of the explosion. The Court previously denied Plaintiffs' motions for partial summary judgment, based on Plaintiffs' failure to adequately set forth the relevant facts and arguments upon which the motions were ostensibly based.[3] Having conducted further discovery, Plaintiffs again move the Court for partial summary judgment, alleging four bases therefor.[4]

First, Plaintiffs allege that there is no coverage for claims arising out of Explo's storage of M6 propellant or other explosive materials, as Explo's storage thereof knowingly violated multiple

---

[2] At some point, the caption in the *Fullerton* suit became *Roger Reeves et al v. Explo Systems Inc. and Crum and Forster Specialty Insurance Company* [*See* Doc. #114, p. 2 n. 2; Doc. #115, p. 1].

[3] Doc. #122.

[4] *See* Doc. #150, p. 7 n. 2.

2

state and federal laws and regulations, rendering such acts subject to the criminal, fraudulent, and dishonest act exclusion. Second, Plaintiffs allege that there is no coverage for any claims arising out of the October 15, 2012 explosion, because said explosion involved smokeless black powder that was purchased by Explo for resale and not covered by the two designated operations, which are thermal treatment and disassembly of ammunition and recycling and separation of remaining scrap. Third, Plaintiffs deny coverage for claims arising out of the evacuation of the area surrounding Camp Minden, because the third-party evacuation claims do not involve claims for bodily injury or property damage as those terms are defined in the CFS policy. Plaintiffs further allege that the commercial property policy issued by Seneca to Explo provides coverage only for direct physical loss of, or damage to, specified property at Camp Minden, which is caused by a covered loss; therefore, Plaintiffs deny coverage for any third-party evacuation claims. And, fourth and finally, Plaintiffs assert that the Seneca Policy does not provide coverage for any third-party claims, as it only provides first-party property coverage to Explo, for direct physical loss of or damage to covered property at the premises, as defined and described therein.

Intervenor responds by arguing that the claims arising out of the explosion and evacuation are covered, for the following four reasons: (1) M6 is a propellant and not an "explosive" as defined in La. Rev. Stat. § 40:1472.2(7); (2) the ammunition shells were at Explo for the purpose of disassembling the ammunition to recover and recycle the metal therein and to thermally destroy the materials after disassembly, such that it could be reasonably anticipated by the policy that the M6 propellant and other materials would be stored at the facility until thermally destroyed; (3) the policy's exclusion for wrongful acts does not apply, as no crimes or intentional acts were committed; and (4) the claims fall within the CFS policy's definitions of bodily injury and property damage that

3

occurred due to Explo's negligent acts or omissions in the storage of explosive material.[5]

## FACTS

Explo leased certain real property, located at Camp Minden, from the Louisiana Military Department ("LMD") pursuant to a commercial lease. CFS issued Policy Number EPK-100814 ("CFS Policy") to Explo for the period from September 12, 2012 through September 12, 2013. The CFS Policy contains three coverage parts: Commercial General Liability Occurrence Coverage, Third Party Pollution Liability Coverage, and Onsite Cleanup Pollution Liability Coverage. A Designated Operations Coverage Endorsement attached to the policy provides that coverage under all three parts of the CFS Policy applies only to "bodily injury" or "property damage" arising out of "the designated operations indicated in the Schedule[:]" (1) thermal treatment and disassembly of ammunition and (2) recycling and separation of remaining scrap.[6] The CFS Policy also includes an exclusion for illegal or wrongful acts, which reads:

> This policy does not apply to "damages", "defense expenses", "cleanup costs", or any loss, cost, or expense, or any "claim" or "suit":
>
> 3.    Criminal, Fraudulent or Dishonest Acts
>
> Based upon or arising out of:
>
> > a.    Any criminal, fraudulent, or dishonest act, omission, or offense committed by the insured...
> >
> > b.    Any act, omission, or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage;
> >
> > c.    The obtaining by the insured of any profit, gain or advantage to

---

[5] Doc. #167, p. 6.

[6] Doc. #150-4.

which the insured is not legally entitled[.][7]

The Covered Locations Endorsement to the CFS Policy describes the two, above-stated designated operations at the Camp Minden site, as being covered under the Third Party Pollution Liability and Onsite Cleanup Coverage Parts.[8]

Seneca issued Commercial Property Policy Number SSP 22 011 76 ("Seneca Policy") to Explo for the period from January 22, 2012 through January 22, 2013. The Building and Personal Property Coverage Form in the Seneca Policy provides that the insurer "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."[9] The Seneca Policy defines Covered Property to include buildings, business personal property of the insured, and personal property of others in the care, custody, or control of the insured for which a limit of insurance is shown in the Declarations section of the Seneca Policy. The exclusions section of the Seneca Policy includes an exclusion for "land (including land on which the property is located), water, growing crops or lawns."[10]

In the ordinary course of business, Explo stored materials it disassembled and/or removed from ordnance as part of its demilitarization process at Camp Minden. The October 15, 2012 explosion occurred in one trailer and one bunker, leased and operated by Explo at Camp Minden. The only material stored in the trailer and bunker involved in the explosion was black smokeless

---

[7] Doc. #150-3, p. 3.

[8] Doc. #150-2, p. 72.

[9] Doc. #150-5, p. 8.

[10] *Id.* at p. 9.

5

powder, which had been purchased for re-sale by Explo from Alliant Techsystems, Inc. ("Alliant").[11] The black smokeless powder, in the trailer and bunker involved in the explosion, was not part of the thermal treatment and disassembly of ammunition nor was it part of the recycling and separation of remaining scrap.[12] The Louisiana State Police ("LSP") were notified of the explosion, and sent an investigator to the site, on the morning of October 16, 2012.[13] LSP's Hazardous Materials Incident Report involved only smokeless powder; there is no reference therein to M6 propellant.[14]

Thereafter, LSP discovered that Explo was storing more than 15 million pounds of unsecured M6 propellant, outside of bunkers, in the portion of Camp Minden where Explo performed its operations.[15] LSP also discovered more than 8 million pounds of other explosives, improperly stored inside of bunkers. On November 28, 2012, inspectors found more than one million pounds of explosives, improperly stored in cardboard boxes in a field at Camp Minden.[16] As a result, that same day, the surrounding area, including the town of Doyline, Louisiana, was evacuated, because the improperly stored M6 propellant and other explosives presented a

---

[11] Intervenor alleges that Alliant's sale of powder to Explo was an effort by Alliant, a manufacturer of ball powder, to recycle unusable material, and is a covered activity under the CFS policy [Doc. #167-5, ¶ 9]. This contention fails to dispute Plaintiffs' statement that the powder was not part of the demilitarization process at Camp Minden, and Explo has admitted that the black smokeless powder was not part of the thermal treatment and disassembly of ammunition nor was it part of the recycling and separation of remaining scrap [Doc. #186, p. 2].

[12] Doc. #186, p. 2.

[13] Doc. #150-8.

[14] *Id.*

[15] Doc. #186, p. 3. Although Plaintiffs reference the amount of stored materials in terms of "tons" in Doc. #186, all other references are to "pounds;" therefore, the Court has maintained that reference.

[16] *Id.* at p. 5.

6

potential risk to the town and its residents.[17]

The Louisiana National Guard ("LNG"), as owner of Camp Minden, requested that the Army assess the potential short- and long-term hazards associated with the presence of M6 propellant at the site.[18] After sending technical assistance teams to the site on April 2–3, 2013, and on May 7–9, 2013, the Army provided two reports to the LNG, dated April 18, 2013 and June 13, 2013. On its initial visit, the Army team conducted an explosives safety analysis, resulting in several recommendations to improve conditions, lessen the risk of future explosions, and increase public safety. However, implementation of the Army's recommendations *still* would not bring the site into compliance with Department of Defense ("DOD") 6055.09-M, the standards established to "minimize serious injury, loss of life, and damage to property."[19] The Army also identified examples of M6 propellant being stored and/or re-packaged in an unsafe manner and concluded that "the probability of an explosives event directly related to the long-term storage of M6 propellant at Minden is likely."[20] In the June report, the Army warned that even though actions had been taken to minimize the risk to public safety, there was uncertainty about the stability of the propellant, such that "an explosive event (i.e., a detonation) from auto-ignition is very possible without a propellant stability monitoring program in place."[21]

---

[17] *Id.* at pp. 3 and 5.

[18] Doc. #150-9.

[19] Doc. #150-10, p. 7; Doc. #150-11, p. 2.

[20] Doc. #150-10, p. 21.

[21] *Id.* at p. 31. (Total estimated hazardous and/or explosive materials at Camp Minden included: 15-16 million pounds of M6 propellant; 1.817 million pounds of Tritonal (aluminum/TNT) mixture; 661,000 pounds of Nitrocellulose; 320,000 pounds of Clean Burning Incendiary (CBI); 128 pounds of black powder; 200 pounds of Composition H6; Four 50-gallon drums of ammonium perchlorate; Two 50-gallon drums and 3-50 pound boxes of Explosive D (ammonium picrate); 109,000 pounds of M30

In August of 2013, the Environmental Protection Agency ("EPA") asked that the DOD reconsider its level of participation in the responsive actions necessary to address the millions of pounds of "improperly stored explosive materials[,]" which created "an imminent and substantial endangerment to public health, welfare, and the environment."[22] On September 6, 2013, Louisiana declared a State of Emergency at Camp Minden and expressly cited LSP's discovery that the October 2012 explosion involved smokeless powder and subsequent discovery of Explo's improper storage of millions of pounds of M6 propellant, which led to the seven-day evacuation of Doyline and closure of large parts of Camp Minden for several months.[23] In October of 2013, the LNG requested support from the DOD in disposing of the M6 propellant and other explosive materials at Camp Minden.

In January of 2014, the EPA, acting pursuant to its authority under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") entered into an Administrative Settlement Agreement and Order on Consent for Removal Action ("AOC") with General Dynamics Ordnance and Tactical Systems, Inc. and Alliant.[24] The parties agreed that the removal actions, pertaining to the disposal or treatment of hazardous materials in connection with Explo's operations, were "necessary to protect the public health, welfare, or the environment." The AOC recited that LSP's post-explosion investigation revealed:

9-10 million pounds of unsecured and improperly stored M6 propellant. The M6

---

propellant; Unknown volume of Red Water (water contaminated with TNT); and Effluent associated with the Super Critical Water Oxidation Unit (SCWO). [*See* Doc. #150-24, p. 4]).

[22] Doc. #150-12.

[23] Docs. ##150-13 and 150-14.

[24] Doc. #150-19.

propellant was stored in 60 pound cardboard boxes, 110-140 pound drums and 880 pound super sacks throughout [Explo] Site buildings, hallways, and outside.

…

Additional investigation of the Explo Site revealed the improper storage of other materials, in addition to the M6 propellant. For example, the Army's Explosives Safety Board 2013 safety reviews show the materials stored at the Site included: 1) 128 pounds of black powder; 2) 200 pounds of Composition H6; 3) four 50-gallon drums of ammonium perchlorate; 4) two 50-gallon drums and two 150 pounds boxes of Explosive D (ammonium picrate); 5) 109,000 pounds of M30 propellant; 6) 320,000 pounds of Clean Burning Incindiary (CBI); 7) 661,000 pounds of nitrocellulose; 8) 1.817 million pounds of tritonal mixed with wax/tar; and 9) 15 million pounds of M6 propellant.[25]

On March 18, 2014, the EPA issued a Unilateral Administrative Order ("UAO") to the Army, in which the EPA determined that the Army either had contributed or was contributing to the "improper handling and storage of approximately 15 million pounds of M6 propellant" at Camp Minden that presented an "imminent and substantial risk that the M6 propellant (which is stored in proximity to 3 million pounds of other explosives) may auto-ignite, and cause a substantial explosion."[26] In June of 2014, the EPA requested that the Army provide another technical assistance visit to Camp Minden, due to the EPA's concerns that conditions may be increasingly deteriorating, noting specific examples of improper storage.[27] On October 28, 2014, the Army and the LMD entered into an AOC with the EPA, which included removal response actions addressing approximately 15-16 million pounds of explosives and other hazardous

---

[25] *Id.* at p. 8, ¶¶ (c) and (d).

[26] Doc. #150-21, p. 5. (The EPA issued the UAO pursuant to Section 7003 of the Resource Conservation and Recovery Act (RCRA), codified at 42 U.S.C. § 6973. The Army unsuccessfully requested that the UAO be withdrawn, to which the EPA issued a lengthy response, on July 16, 2014, discussing Explo's improper and illegal storage of M6 propellant at Camp Minden. [*See* Doc. #150-22]).

[27] Doc. #150-20.

materials.[28] That same day, the EPA also requested time-critical removal, again reporting on Explo's improper and illegal storage of M6 propellant and other explosives.[29]

Explo admitted that the M6 propellant is an "explosive" as defined under La. Rev. Stat. § 40:1472.2(7).[30] Some or all of the M6 propellant was not stored in a properly licensed storage magazine, under La. Rev. Stat. § 40:1472.3.[31] Explo knew that its storage of M6 propellant at Camp Minden was wrongful and violated La. Rev. Stat. § 40:1472.12, Unlawful Storage of Explosives, which requires that all explosives in Louisiana be in a properly licensed storage magazine.[32] Explo knew that it stored, handled, or transported M6 propellant and other explosives in a manner that endangered or could endanger human life, health, or property, in violation of La. Rev. Stat. § 40:1472.19, Reckless Storage of Explosives.[33]

Prior to the 2012 explosion, Explo improperly stored one million pounds of explosives at its Camp Minden operations; failed to maintain its Camp Minden facilities in accordance with the law; failed to maintain proper regard and concern for the safety and well-being of persons and property in the vicinity of Camp Minden; failed to take reasonable steps to prevent the 2012

---

[28] Doc. #150-23.

[29] Doc. #150-24, p. 4.

[30] Doc. #186, p. 4. Intervenor admits that Explo violated state law, *compare* Doc. #167-5, p. 3, ¶¶ 29 and 33, but disputes that M6 propellant is an explosive under Louisiana law, *with id.* at ¶ 31. However, Intervenor's evidence fails to bring Explo's admitted fact into question. The testimony of Colonel Bradley is offered to prove that M6 is not an explosive under Louisiana law. However, Col. Bradley is not asked whether M6 is an explosive, as that term is defined under La. Rev. Stat. § 40:1472.2(7), and he repeatedly qualifies his own testimony by admitting that he is "not an explosive chemist." *See e.g.* Doc. #167-1, pp. 6 and 7.

[31] *Id.*

[32] *Id.*

[33] *Id.* at pp. 4-5.

explosion and other explosions; and failed to take reasonable and necessary steps to insure that the explosives stored at Camp Minden would be stored in a safe manner, as required by law.[34] At the time of the 2012 explosion, Explo failed to properly mark explosive material at Camp Minden, as required by La Rev. Stat. § 40:1472.5(A), and did not maintain accurate inventories, as required by La Rev. Stat. § 40:1472.5(B).

Explo recklessly failed to exhibit responsible care for explosives safety and failed to create and enforce an explosives safety culture.[35] Explo stored approximately 15 million pounds of explosive material on 7,500 pallets and improperly configured and stored these pallets in close proximity to one another in a position where the sympathetic propagation of an explosive impulse would transmit in a donor/receptor mechanism, in which the explosive detonation event could jump from one pallet to another. Explo did not fully obey Department of Transportation regulations that required Explo to regularly perform scientific analytical testing for sufficient residual stabilizers in the M6 propellant. Storing M6 propellent and other explosive materials in this manner was dangerous, unreasonable, improper, and in violation of state and federal law.

By routinely storing millions of pounds of M6 propellant and other explosive material outside in the open air and in other non-approved explosive storage buildings and facilities, Explo failed to comply with 27 C.F.R. § 555.205, which requires that all explosive material be kept in locked magazines meeting certain requirements, unless the explosive material is being manufactured, physically handled in the operating process, being used, or being transported.

---

[34] *Id.* at pp. 5-6.

[35] While Plaintiffs contend that Explo's actions were willful, in addition to being reckless, Intervenor argues that "[t]here is no evidence ... that any act was willful as opposed to being caught in a downturn of the economy and unable to dispose of recycled material." *See* ¶¶ 27, Docs. #151 and 167-5.

11

Explo failed to store M6 propellant and other explosive materials at Camp Minden in compliance with 18 U.S.C. § 842(j) which provides that it is unlawful to store explosive materials in a manner not in conformance with the regulations promulgated by the Attorney General of the United States, 27 C.F.R. § 555 *et seq.*

Explo and several of its officers and employees were holders of Louisiana state licenses for the handling, processing, transportation, and storage of explosive materials. In June of 2013, Explo and several of its officers and managers were criminally indicted in Webster Parish, on charges relating to the handling and storage of explosives and explosive materials at Camp Minden.[36] In August and October of 2013, three of those individuals pled guilty to the charge of careless use of explosives.[37] On October 3, 2014, Explo's bankruptcy trustee obtained permission from the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division, to enter a felony guilty plea on behalf of Explo, to one of the charges lodged against it.[38] The trustee's request was based on his determination that it was in "the best interests of the bankruptcy estate . . . to plead the company guilty of one felony charge, probably unlawful storage of explosives, and end this matter."[39]

## LAW AND ANALYSIS

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[36] Doc. #150-15.

[37] Doc. #150-16.

[38] Doc. #150-17 (Doc. # 341, Case No. 13-12046, *In Re Explo Systems, Inc.* (Bankr. W. D. La.)).

[39] Doc. #150-17, p. 4, ¶ 9.

to judgment as a matter of law."[40] A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in [his] favor." *Norwegian Bulk Transport A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23). To this end, "[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id.* at 412. Incorporated herein are facts which, on prior motion of the Plaintiffs, were deemed admitted, pursuant to a memorandum order issued by the magistrate judge.[41] Rule 36, pursuant to which those certain facts were deemed admitted, permits admissions regarding a broad range of matters, including ultimate facts and applications of law to fact. *In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001) (citations omitted). Where, as here, "the requests for admissions concern an essential issue, the failure to respond to requests for admission can lead to a grant of summary judgment against the non-responding party." *Murrell v. Casterline*, 307 F. App'x 778, 780 (5th Cir. 2008) (citing *Dukes v. S. Carolina Ins. Co.*, 770 F.2d 545, 548–49

---

[40] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this court will rely on it accordingly.

[41] *See* Docs. ##164, 185, and 186.

(5th Cir. 1985)).

Where federal jurisdiction is based on diversity of citizenship, a federal court applies the substantive law of the forum state. *Foradori v. Harris*, 523 F.3d 477, 486 (5th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938)). The parties agree that Louisiana law applies in this case. "Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment." *Huggins v. Gerry Lane Enterprises, Inc.*, 2006-2816 (La. 5/22/07), 957 So. 2d 127, 129.

Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So.2d 577, 580. Louisiana's Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045; *see also Cadwallader*, 848 So.2d at 580. "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader*, 848 So.2d at 580. If, however, there is any ambiguity, "[t]he court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry.'" *Louisiana Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94); 630 So.2d 759, 764 (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990)). "Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Huggins,* 957 So. 2d at 129; La. Civ. Code art. 2047 (citations omitted).

An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or

14

application attached to or made a part of the policy." La. Rev. Stat. § 22:881. An insurance contract "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 208 (5th Cir. 2007) (quoting *Cadwallader*, 848 So.2d at 580). "The fact that a term is not defined in the policy itself does not alone make that term ambiguous." *Id.* (citing *Am. Deposit Ins. Co. v. Myles*, 2000-2457 (La. 4/25/01); 783 So.2d 1282, 1287). "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Id.* (quoting *Cadwallader*, 848 So.2d at 580).

"Unless a policy conflicts with statutory provisions or public policy, it may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes." *Huggins*, 957 So. 2d at 129 (citing *Carbon v. Allstate Ins. Co.*, 97-3085, p. 4 (La. 10/20/98); 719 So.2d 437, 439) (citation omitted). Under Louisiana law, the insured bears the burden of establishing that the claim falls within the policy coverage; the burden shifts to the insurer to prove the applicability of an exclusion within the policy. *See Doerr v. Mobil Oil Corp.*, 2000-0947 (La. 12/19/00); 774 So.2d 119, 124. As stated, the CFS Policy provided coverage for "bodily injury" or "property damage" arising out of "the designated operations indicated in the Schedule[,]" which included: thermal treatment and disassembly of ammunition; and recycling and separation of remaining scrap. According to the declaration of Plaintiffs' explosives expert Robert C. Morhard,[42]

---

[42] Although Intervenor generally admits to the opinions offered by Plaintiffs' expert, *see* Doc. #151, pp. 10-14, Intervenor also argues via footnote that the expert's report is inadmissible hearsay and contains statements adverse to Plaintiffs' position and thus admissions against interest, *see* Doc. #167, p. 9 n. 6. The Court notes that the admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment. *First United Financial Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 136-37 (5th Cir. 1996). Having reviewed Morhard's declaration and expert qualifications, and noting the

those operations refer "to the process by which military ordnance is disassembled and its constituent parts are disposed of in various ways[,]" including being sold for other uses or discarded.[43] By way of example, Morhard explains:

> the charge of a 155 mm shell, such as the ones that Explo was disassembling at Camp Minden, will contain approximately 20.9 pounds of M6 propellant (which is 87% nitrocellulose), 4 ounces of clean burning incendiary ("CBI") powder and 0.5 ounces of black powder in the base igniter pad, and a flash reducer consisting of 1 pound of potassium sulfate and 3 ounces of lead foil.[44]

The parties agree that the October 15, 2012 explosion did not involve M6 propellant.[45] Rather, the explosion involved one trailer and one bunker, in which the only stored material was black smokeless powder, which had been purchased for re-sale by Explo from Alliant. Although Intervenor alleges that Alliant's sale of powder to Explo was an effort by Alliant, a manufacturer of ball powder, to recycle unusable material and is thus a covered activity under the CFS Policy, this contention fails to dispute Plaintiffs' statement that the powder was not part of the demilitarization process at Camp Minden. Furthermore, Explo has admitted that the black smokeless powder was not part of either the thermal treatment and disassembly of ammunition or the recycling and separation of remaining scrap. Despite this admission, Intervenor focuses on the absence of any evidentiary facts surrounding the pre-explosion storage conditions of the powder and whether said conditions violated any laws. However, Explo's admission, that the black smokeless powder was not part of either of the two designated operations under the CFS Policy, places the explosion, and claims

---

lack of any serious objection to the reliability of his expert opinion, the Court finds Morhard's opinion to be reliable, to the extent relied upon herein.

[43] Doc. #150-25, p. 5.

[44] *Id.*

[45] Doc. #167, p. 9 ("M6 was not what exploded."); Doc. #151, p. 3, ¶8.

arising therefrom, beyond the scope of the risk assumed by the CFS Policy. Any discussion of the applicability of exclusions to explosion-related claims is unnecessary, because coverage has not been established.

Similarly, the Court is unpersuaded by Intervenor's argument in favor of coverage for Explo's storage of the M6 propellant. Intervenor contends that it could be reasonably anticipated, under the CFS Policy, that the M6 propellant and other materials would be stored at the facility until thermally destroyed, during the designated operations. The Court finds that the improper nature of Explo's extensive storage of such an enormous amount of M6 propellant, as well as the investigative reports and correspondence in the record, arguably renders Explo's actions outside of the designated operations as it seems unreasonable that such storage would be considered part of the disassembling and recycling operations. However, in light of the evidence before the Court, it is prudent to discuss the criminal, fraudulent, and dishonest acts exclusion in the context of the M6 propellant, which was the cause of the post-explosion evacuation. The record is replete with overwhelming evidence of the illegal and improper nature of Explo's actions, involving conscious and knowing decisions to improperly store millions of pounds of M6 propellant and other explosive materials at Camp Minden. Intervenor's primary arguments against the application of this exclusion are, first, that M6 is not an "explosive" under Louisiana law, and second, that no crimes or intentional acts were committed.

As to Intervenor's first argument, regarding whether or not M6 is an "explosive," the Court finds Intervenor's contentions meritless. As stated, Explo admitted that the M6 propellant is an "explosive," as defined under La. Rev. Stat. § 40:1472.2(7). This fact finds ample support in the record evidence, including investigative reports of the Army and LSP, EPA orders and documents,

and consent orders entered into by the EPA and various entities involved in emergency removal actions. Even assuming, *arguendo*, that Explo's admission that M6 propellant is an explosive as defined by La. Rev. Stat. § 40:1472.2(7) does *not* suffice to establish that fact, it is undisputed that Explo's storage of M6 was a violation of 18 U.S.C. § 842(j), which provides that it is unlawful to store explosive materials in a manner not in conformance with the regulations promulgated by the Attorney General, pursuant to which M6 is an explosive. Again, Explo has admitted that its storage of M6 propellant was improper and illegal under various state and federal laws, specifically delineated in the above fact section, and Intervenor has not seriously contested or disputed those admissions. Instead, citing no law in support thereof, Intervenor argues that the criminal, fraudulent and dishonest acts exclusion does not necessarily apply to criminal acts if those acts are merely misdemeanors. The Court rejects this argument.

Intervenor's second argument is that the word "criminal" must be read in the context of both "fraudulent" and "dishonest," such that the exclusion cannot apply because Explo fairly, accurately and honestly disclosed the nature of its operations to CFS and Seneca. On Explo's application for insurance coverage, submitted to CFS in September of 2011, Explo described its current operations as: "disassemble and recycle military bombs for [the government]."[46] On its renewal application, submitted to CFS on August 21, 2012, Explo described its current operations as: "demilitarization and recycling of energetics" and "disassembly and recycling of military munitions."[47] The Court fails to appreciate those statements by Explo as being "honest disclosures" of the improper and illegal nature of Explo's actions in storing millions of pounds of unsecured M6 propellant and other

---

[46] Doc. #167-3, p. 1.

[47] *Id.* at p. 5.

18

explosive materials. But, more significantly, the Court declines to adopt Intervenor's narrow reading of the exclusion.

Louisiana requires a policy to be construed so as to give effect, if possible, to every provision therein. *Huey T. Littleton Claims, Inc. v. Employers Reinsurance Corp.*, 933 F.2d 337, 340 (5th Cir. 1991); *Hemel v. State Farm Mut. Auto. Ins. Co.*, 29 So.2d 483 (La. 1947). The exclusion applies to both: any criminal, fraudulent, or dishonest act, omission, or offense; or any act, omission, or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage. The record before the Court, including determinations by the LSP, LNG and EPA that Explo improperly and illegally stored explosives and the admissions that Explo knew that such storage was wrongful, gives the Court no pause in deciding that this policy exclusion disallows coverage for damages arising from the evacuation, which was ordered upon discovery of the improper and illegal storage of millions of pounds of explosives at Camp Minden. It is undisputed that Explo's storage thereof constituted violations of the following: La. Rev. Stat. § 40:1472.3; La Rev. Stat. § 40:1472.5(A) and (B); La. Rev. Stat. § 40:1472.12; La. Rev. Stat. § 40:1472.19; 18 U.S.C. § 842(j); and 27 C.F.R. § 555.205. It is further undisputed that at least some of those violations were knowing violations, as evidenced by both Explo's admissions thereof and the training that Explo's officers and employees received as holders of licenses issued by Louisiana for the handling, processing, transportation and storage of explosive materials. Explo knew that it stored M6 propellant and other explosive materials in a manner that endangered or could endanger human, life, health or property. Therefore, because the evacuation was the result of Explo's storage of millions of pounds of unsecured M6 propellant and other explosive materials and that storage was in knowing violation of state and federal laws, the Court finds that evacuation-related claims arising

out of Explo's actions are excluded from coverage under the CFS Policy.

Regarding the Seneca Policy, Plaintiffs correctly point out that there is no substantive opposition to the motion for summary judgment. Intervenor's opposition, in large part, conflates the two policies and references merely "the policy" throughout. To the extent Seneca is discussed in isolation, the discussion does not extend to substantive opposition. Therefore, the Court finds that Seneca is entitled to summary judgment and has no duty to indemnify Explo or intervenors for any claims arising out of the October 15, 2012 explosion at, or subsequent evacuation of, Camp Minden.

## CONCLUSION

Plaintiffs have shown, through the admissions of Explo and the evidence of record, that they are entitled to summary judgment on all bases discussed herein. All claims arising out of the October 15, 2012 explosion are outside the scope of coverage of the CFS Policy, and all claims arising out of the subsequent evacuation are excluded from coverage under the CFS Policy. Seneca likewise has no duty to indemnify Explo or intervenors for any claims arising out of the explosion or evacuation. Accordingly, the motion for partial summary judgment [Doc. #149] is hereby **GRANTED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this _15_ day of January, 2016.

                                             DONALD E. WALTER
                                        UNITED STATES DISTRICT JUDGE